[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APR 6, 2006
THOMAS K. KAHN
CLERK

_____

No. 04-15128

_____

D. C. Docket No. 04-20299-CR-DMM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MICHAEL WILLIAMS,

Defendant-Appellant.

_____

Appeal from the United States District Court for
the Southern District of Florida

_____

**(April 6, 2006)**

Before BARKETT, WILSON and REAVLEY[*], Circuit Judges.

REAVLEY, Circuit Judge:

---

[*] Honorable Thomas M. Reavley, United States Circuit Judge for the Fifth Circuit, sitting by designation.

Michael Williams appeals his conviction for promotion of child pornography under 18 U.S.C. § 2252A(a)(3)(B) on the grounds of facial unconstitutionality. For this reason, we reverse that conviction. Williams was also convicted of possession of child pornography under 18 U.S.C. § 2252A(a)(5)(B), and he appeals his sentence for that offense on the grounds that the court unconstitutionally enhanced his sentence under a mandatory guidelines scheme in violation of *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738 (2005). Because there was no reversible *Booker* error, we affirm Williams's sentence of 60-months' imprisonment.

## I. The Charges

On April 26, 2004, as part of an undercover operation aimed at combating child exploitation on the Internet, United States Secret Service Special Agent (SA) Timothy Devine entered an Internet "chat" room using the screen name "Lisa_n_Miami" (LMN). SA Devine observed a public message posted by a user employing a sexually graphic screen name, which was later traced to the defendant Williams. Williams's public message stated that "Dad of toddler has 'good' pics of her an [sic] me for swap of your toddler pics, or live cam." SA Devine as LNM engaged Williams in a private Internet chat during which they swapped non-pornographic photographs. Williams provided a photograph of a two to three-

2

year-old female lying on a couch in her bathing suit, and five photographs of a one to two-year-old female in various non-sexual poses, one of which depicted the child with her breast exposed and her pants down just below her waistline. LNM sent a non-sexual photo of a college-aged female digitally regressed to appear ten to twelve years old, who LNM claimed was her daughter.

After the initial photo exchange, Williams claimed that he had nude photographs of his four-year-old daughter, stating "I've got hc [hard core] pictures of me and dau, and other guys eating her out - do you??" Williams asked for additional pictures of LNM's daughter. When these pictures were not received, Williams accused LNM of being a cop. LNM responded by accusing Williams of being a cop. After repeating these accusations in the public part of the chat room, Williams posted a message stating "HERE ROOM; I CAN PUT UPLINK CUZ IM FOR REAL -SHE CANT." The message was followed by a computer hyperlink, which SA Devine accessed. The computer hyperlink contained, among other things, seven images of actual minors engaging in sexually explicit conduct. The nude children in the photos were approximately five to fifteen years old, displaying their genitals and/or engaged in sexual activity.

Secret Service agents executed a search warrant of Williams's home. Two computer hard drives seized during the search held at least twenty-two images of

3

actual minors engaged in sexually explicit conduct or lascivious display of genitalia. Most of the images depicted prepubescent children and also depicted sado-masochistic conduct or other depictions of pain.

Williams was charged with one count of promoting, or "pandering," material "in a manner that reflects the belief, or that is intended to cause another to believe," that the material contains illegal child pornography in violation of 18 U.S.C. § 2252A(a)(3)(B), which carries a sixty-month mandatory minimum sentence. Williams was also charged with one count of possession of child pornography under 18 U.S.C. § 2252A(a)(5)(B).

Williams filed a motion to dismiss the pandering charge on the grounds that 18 U.S.C. § 2252A(a)(3)(B) is unconstitutionally overbroad and vague. While the motion was pending before the trial court, the parties reached a plea agreement by which Williams would plead guilty to both counts but reserve his right to challenge the constitutionality of the pandering provision on appeal. The court sentenced Williams to sixty-months' imprisonment for the pandering charge and sixty months for the possession charge, to be served concurrently.

## II. Williams's Facial Challenge to 18 U.S.C. § 2252A(a)(3)(B)

### A. Standard of Review

We review a district court's conclusion as to the constitutionality of a challenged statute de novo.[1]

## B. The Child Pornography Problem

In this case, we consider the constitutionality of a law aimed at curbing the promotion, or "pandering,"[2] of child pornography. Relevant to this case, there are two types of child pornography. Roughly speaking, "actual" or "real" child pornography depicts true minors engaged in sexual conduct. In contrast, "virtual" child pornography depicts what appear to be actual minors engaged in sexual conduct, but in reality consists of computer-generated or enhanced images. Child pornography images of both types are typically circulated through the Internet. While society has benefitted greatly from the technological advances of the last

---

[1] *United States v. Panfil*, 338 F.3d 1299, 1300 (11th Cir. 2003).

[2] "Pandering" is defined as the catering to or exploitation of the weaknesses of others, especially "to provide gratification for others' desires." *See* MERRIAM WEBSTER ONLINE DICTIONARY, http://www.m-w.com (last visited March 23, 2006). As a legal concept, pandering is most commonly associated with prostitution. In that context, pandering provisions are statutes penalizing various acts by intermediaries who engage in the commercial exploitation of prostitution and are aimed at those who, as agents, promote prostitution rather than against the prostitutes themselves. The term pandering, in some instances, is applied by Congress and the courts to the promotion of obscenity. *See, e.g.,* 39 U.S.C. § 3008 (prohibiting pandering advertisements of sexually provocative materials by mail), *Ginzburg v. United .States*, 383 U.S. 463, 86 S. Ct. 942 (1966) (considering obscene nature of erotically advertised publications). Congress has characterized both the child pornography regulation at issue in this case (18 U.S.C. 2252A(a)(3)(B)) and its unconstitutional predecessor (18 U.S.C. § 2256(8)(D) (1996)) as "pandering" provisions.

5

decade, an unfortunate byproduct of sophisticated imaging technology and the rise of the Internet has been the proliferation of pornography involving children.[3]

The anonymity and availability of the online world draws those who view children in sexually deviant ways to websites and chat rooms where they may communicate and exchange images with other like-minded individuals. The result has been the development of a dangerous cottage industry for the production of child pornography as well as the accretion of ever-widening child pornography distribution rings.[4] Our concern is not confined to the immediate abuse of the children depicted in these images, but is also to enlargement of the market and the universe of this deviant conduct that, in turn, results in more exploitation and abuse of children. Regulation is made difficult, not only by the vast and sheltering landscape of cyberspace, but also by the fact that mainstream and otherwise

---

[3] Total federal prosecutions of child pornography cases increased more than 452% from 1997 to 2004. Statement of Laura H. Parsky, Deputy Asst. Attorney General, Criminal Division before the Comm. On Commerce, Science, and Transportation, United States Senate Concerning Protecting Children on the Internet. January 19, 2006.

[4] In 1998, police cracked the "Wonderland Club," an Internet child pornography ring that involved members across twelve countries, and whose "chairman" was an American, uncovering some 750,000 images of children. Membership rules required each member to possess at least 10,000 images of pre-teen children and to agree to exchange them with other members. Other rings promote the worst imaginable forms of child pornography, such as "custom" child pornography (images of child rape created to order for the consumer) and "real time" child pornography, where members may watch the online rape of children as it occurs. In early 2006, federal authorities shut down an Internet web site called "Kiddypics & Kiddyvids" that streamed video of live child molestations involving children as young as eighteen months.

innocuous images of children are viewed and traded by pedophiles as sexually stimulating.

Over the years, Congress has, by large bipartisan majorities, enacted legislation designed to punish those who produce, peddle, or possess child pornography. Congress has struggled to draft legislation that captures the truly objectionable child-exploitative materials while staying within the boundaries of the Supreme Court's First Amendment jurisprudence. The protection of our children against sexual abuse and predatory pedophiles is of extraordinary importance. We do not question that strong federal laws are needed, but they must pass constitutional muster. In other words, Congress may not "burn the house to roast the pig."[5] Whether that difficult balance has been struck in the instant legislation is the issue before us.

## C. The Law and Child Pornography

We begin with a brief overview of child pornography law, which as a distinct body, is of relatively recent vintage. The regulation of child pornography was initially rooted in the Supreme Court's obscenity doctrine. In *Miller v. California*,[6] the Court set forth the three-prong social merit test for determining

---

[5] *Butler v. Michigan,* 352 U.S. 380, 383, 77 S. Ct. 524, 526 (1957).

[6] 413 U.S. 15, 93 S. Ct. 2607 (1973). The *Miller* test defines obscenity as a work that (1) taken as a whole, appeals to the prurient interest under contemporary community standards, (2)

whether materials are obscene, and therefore proscribable as a category of unprotected speech. In *Stanley v. Georgia*,[7] the Court held that privacy interests protect the right to possess obscene materials in one's own home, but subsequently clarified that this sanction does not extend to the distribution or receipt of obscenity, which may be regulated on interstate commerce grounds even if the transportation is for the recipient's personal use.[8] Against this backdrop, Congress passed its first child pornography legislation, the Protection of Children against Sexual Exploitation Act, in 1977.[9] It was keyed to the *Miller* standard, outlawing the use of children in the production of obscene materials and criminalizing the knowing distribution of such materials for commercial purposes.

In 1982, the Supreme Court first dealt directly with the issue of child pornography. In *New York v. Ferber*,[10] a unanimous Court proclaimed that child pornography was a distinct new category of speech without First Amendment

---

depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law, and (3) taken as a whole, lacks serious literary, artistic, political, or scientific value. 413 U.S. at 24, 93 S. Ct. at 2615.

[7] 394 U.S. 557, 568, 89 S. Ct. 1243, 1259-50 (1969).

[8] *See United States v. Orito,* 413 U.S. 139 (1973).

[9] Pub. L. No. 95-225, 92 Stat. 7 (1978) (codified as amended at 18 U.S.C. §§ 2423, 2251-2253).

[10] 458 U.S. 747, 102 S. Ct. 3348 (1982).

protection, holding that the government may constitutionally prohibit the creation or promotion of pornography featuring real children even though it does not meet the *Miller* standard. The primary rationale of *Ferber* was that child pornography must be prohibited because of the intrinsic harm done to children in its production.[11] The Court reasoned that child pornography not only documents an underlying act of abuse — the sexual use of a child — but the recording of the act and subsequent circulation of the images perpetuates the injury to the depicted child.[12]

In response to *Ferber*, Congress passed the Child Protection Act of 1984 (CPA),[13] which was modeled on the New York statute upheld in *Ferber*. The CPA expanded the definition of child pornography to include non-obscene but sexually suggestive pictures of children and eliminated the commercial purposes requirement of earlier proscriptions.
Interstate commerce advertisements and solicitations for child pornography were banned by the Child Sexual Abuse and Pornography Act of 1986.[14]

---

[11] *Id.* at 758, 102 S. Ct. at 335.

[12] *Id.* at 759, 102 S. Ct. at 3355-56.

[13] Pub. L. No. 98-292, 98 Stat. 204 (1984) (codified as amended at 18 U.S.C. §§ 2251-2254, 2256, 2516).

[14] Pub. L. No. 99-628, 100 Stat. 3510 (1986) (codified as amended in scattered sections

Congress first addressed the connection between child pornography and emerging computer technology in the Child Protection and Obscenity Enforcement Act of 1988,[15] which prohibited the use of computers to transport, distribute, or receive child pornography. Shortly thereafter, the Court held in *Osborne v. Ohio*[16] that the *Stanley* right to private possession does not extend to child pornography involving actual children because, unlike adult obscenity, it springs from a grievous harm to children.

In the wake of *Ferber* and subsequent legislation, much of the child pornography industry was driven underground. Then, during the 1990s, advances in photographic and computer-imaging technology made production of child pornography possible without directly employing children. Visual depictions of what appeared to be children engaging in sexually explicit conduct, and that were virtually indistinguishable from images of actual children engaging in such conduct, could be generated. Further, with the advent of the Internet, these "virtual" child pornography images, along with "real" child pornography images, could be readily distributed. However, because the *Ferber* standard only

_____

of 18 U.S.C.).
[15] Pub. L. No. 100-690, 102 Stat. 4485 (1988) (codified as amended at 18 U.S.C. §§ 2251, 2252).

[16] 495 U.S. 103, 109-11 (1990).

10

addressed "live performances," and the visual recordation of same, the existing law left loopholes for the computer-generated images.[17]

To keep pace with these technological developments, Congress passed the Child Pornography Prevention Act of 1996 (CPPA).[18] Congress reasoned that these images, while not involving the use of actual children in their production, would still cause sufficient harm to children to justify banning them in the same way as "real" child pornography. Under the CPPA, the definition of child pornography was extended to cover any visual image that "is, or appears to be, of a minor engaging in sexually explicit conduct"[19] or that has been promoted in a manner that "conveys the impression" that a minor engaging in sexually explicit conduct is depicted.[20] The latter prohibition was referred to as the CPPA's "pandering" provision. The circuit courts that considered challenges to the CPPA were split, with four circuits sustaining the Act as constitutional[21] while the Ninth

---

[17] *Ferber*, 458 U.S. at 764-65, 102 S. Ct. at 3358.

[18] Pub. L. No. 104-208, 110 Stat. 3009 (1996) (codified as amended at 18 U.S.C. §§ 2251 et seq.)

[19] 18 U.S.C. § 2256(8)(B) (1996) (invalidated 2002, amended 2003).

[20] 18 U.S.C. § 2256(8)(D) (1996) (invalidated 2002, amended 2003).

[21] *United States v. Fox,* 248 F.3d 394 (5th Cir. 2001), *vacated by* 535 U.S. 1014, 122 S. Ct. 1602 (2002); *United States v. Mento,* 231 F.3d 912 (4th Cir. 2000); *United States v. Hilton*, 167 F.3d 61 (1st Cir. 1999); *United States v. Acheson,* 195 F.3d 645 (11th Cir. 1999).

Circuit struck it down as overbroad and vague.[22] The Supreme Court granted certiorari in the Ninth Circuit case to resolve the circuit split.

### D. The Supreme Court's Decision in *Free Speech Coalition*

In *Ashcroft v. Free Speech Coalition*,[23] the Supreme Court struck down as unconstitutionally overbroad the two above-referenced subsections of the CPPA's definition of child pornography. The first defined child pornography as any visual depiction, including a computer-generated depiction that "is, or appears to be, of a minor engaging in sexually explicit conduct."[24] The second, CPPA's "pandering" provision, defined child pornography as a "visual depiction [that] is advertised, promoted, presented, described, or distributed in such a manner that conveys the impression that the material is or contains a visual depiction of a minor engaging in sexually explicit conduct."[25] The Court held that these definitions reached more than what could constitutionally be banned as unprotected speech under current obscenity law.[26]

---

[22] *Free Speech Coalition v. Reno,* 198 F.3d 1083 (9th Cir. 1999).

[23] 535 U.S. 234, 122 S. Ct. 1389 (2002).

[24] 18 U.S.C. § 2256(8)(B) (1996) (invalidated 2002, amended 2003).

[25] 18 U.S.C. § 2256(8)(D) (1996) (invalidated 2002, amended 2003).

[26] *See Free Speech Coalition*, 535 U.S. at 240, 251, 122 S. Ct. at 1396, 1402 (citing *Miller,* 413 U.S. 15, 93 S. Ct. 2607 (1973), and *Ferber*, 458 U.S. 747, 102 S. Ct. 3348 (1982)).

The first definition was deemed overbroad because it prohibited speech (virtual or computer depictions, artistic works, or cinematic depictions of youthful actors) that was not obscene under *Miller,* and which recorded no crime and created no victims through its production, as did the "real" child pornography in *Ferber*.[27]  The second definition, the "pandering" provision, was deemed overbroad because it defined as child pornography materials that had been promoted "convey[ing] the impression" that sexually explicit depictions involving minors would be found within the material, even when, in fact, there were no such scenes.  This subsection thus criminalized downstream possession of material described, or pandered, as child pornography by someone earlier in the distribution chain even if no minors were actually involved in the production.  Finding the government's evidence insufficient to show any harm in material merely pandered as containing child pornography, the Court criticized the

---

[27]The Court noted that, although they clearly could not be considered obscene under *Miller*, Renaissance paintings, productions of Shakespeare's "Romeo and Juliet," and noteworthy films such as "Traffic" and "American Beauty" could be swept within the ambit of the CPPA, since arguably they contain some graphic depictions that "appear to be" of minors engaging in sexual activity (even though such images neither involve nor harm children in the production process), and because the CPPA provided no pause for inquiry into the work's redeeming value considered in totality.  535 U.S. at 246-48, 122 S. Ct. at 1400.

provision because it criminalized speech based solely "on how the speech is presented" rather than on "what is depicted."[28]

Although the Court found the CPPA inconsistent with *Miller* and lacking support in *Ferber*, the government attempted to justify the definitions in other ways. The government argued that virtual child pornography can be used to seduce children into participating in sexual activity, and that such materials also "whets the appetites" of pedophiles, encouraging them to engage in illegal conduct.[29] The Court rejected these arguments, noting that other laws, such as those that prohibit unlawful solicitation of a minor, more closely regulate the unsavory use of virtual child pornography; and that the government may not prohibit speech on the grounds that it may merely encourage, and not incite, pedophiles to engage in illicit conduct.[30]

The government next argued that its objective of eliminating the market for "real" child pornography necessitates a prohibition on virtual images as well because, since they are often indistinguishable and traded in the same market, the synthetic images promote the trafficking of works produced through the

---

[28] *Id.*. at 257, 122 S. Ct. at 1405-06.

[29] *Id.* at 251-53, 122 S. Ct. at 1402-03.

[30] *Id.* at 251-54, 122 S. Ct. at 1402-04.

exploitation of real children.[31]  The Court rejected this market deterrence theory, noting that, "[i]n the case of the material covered by *Ferber* [depictions of actual minors engaged in sexual acts], the creation of the speech is itself the crime of child abuse; the prohibition deters the crime by removing the profit motive."[32]  In other words, because no crime underlies the production of virtual child pornography, the production-based rationale set forth in *Ferber* does not apply to synthetic images.

Finally, the Court rejected the government's argument that, since advanced technology makes it difficult to tell whether pictures were made with real children or computer imaging, thus thwarting prosecutorial efforts, both kinds of images must be banned.  The Court stated that the argument, "that protected speech may be banned as a means to ban unprotected speech . . . . turns the First Amendment upside down."[33]

## E.  The PROTECT Act

---

[31]  *Id.* at 254, 122 S. Ct. at 1404.

[32]  *Id.* (citing *Osborne v. Ohio,* 495 U.S. 103, 109-110, 110 S. Ct. 1691(1990)).

[33]  *Id.* at 255, 122 S. Ct. at 1404.  The Court also found that the CPPA's affirmative defense, which allowed offenders in some cases to avoid conviction for nonpossession offenses by showing that materials were produced using only adults and were not otherwise distributed in a manner conveying the impression that they depicted real children, was insufficient to rescue the statute from overbreadth because it was incomplete and shifted the burden to the defendant to prove his speech was not unlawful.  *Id.*

Almost immediately after the *Free Speech Coalition* decision was handed down, Congress began an effort to craft responsive legislation. Two pieces of proposed legislation aimed at revising the objectionable provisions of the CPPA were introduced in the Senate and the House.[34] There was significant debate about key provisions in the competing bills, including the proposed revisions to the pandering provision.[35] Despite ongoing disagreement, the houses compromised and passed the PROTECT Act, now codified in scattered sections of 18 U.S.C.

The revised pandering provision of the PROTECT Act at issue in this case, 18 U.S.C. § 2252A(a)(3)(B), provides that any person who knowingly —

(B)    advertises, promotes, presents, distributes, or solicits through the mails, or in interstate or foreign commerce by any means, including by computer, any material or purported material in a manner that reflects the belief, or that is intended to cause another to believe, that the material or purported material is, or contains —

        (i)    an obscene visual depiction of a minor engaging in sexually explicit conduct; or

---

[34] The Senate introduced S. 151, the Prosecutorial Remedies and Other Tools to End the Exploitation of Children Today Act of 2003 (PROTECT Act), and the House introduced H.R. 1161, the Child Obscenity and Pornography Prevention Act of 2003 (COPPA).

[35] To illustrate, after the House reviewed the Senate's version, it offered an "amendment" to the Senate bill on March 27, 2003, which, in reality, was a recommendation that the Senate's language be replaced in its entirety with the House's version found in the COPPA. (Compare House Amendment to S. 151, Title §§ 501-512 (March 27, 2003) with H.R. 1161, 108th Cong. at §§ 1-4 (2003) (identical language)).

> > (ii)　a visual depiction of an actual minor engaging
> > in sexually explicit conduct;

commits a criminal offense.  For the purposes of this provision, a "minor" means "any person under the age of eighteen years"[36] and "sexually explicit conduct" is defined as "actual or simulated —

> (i)　sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex;

> (ii)　 bestiality;

> (iii)　masturbation;

> (iv)　sadistic or masochistic abuse; or

> (v)　lascivious exhibition of the genitals or pubic area of any person."[37]

Any person who violates, or attempts or conspires to violate, the pandering prohibition is subject to a fine and imprisonment for a minimum of five years and up to twenty years.[38]  It is an affirmative defense for certain reproducers, distributors, recipients, and possessors of child pornography charged under other subsections of § 2252A that the alleged child pornography depicts actual adults

---

[36]  18 USC § 2256(1).

[37]  18 U.S.C. § 2256(2).

[38]  18 USC § 2252A(b)(1).

rather than minors or that no "actual" minors were involved in the production.[39]

However, the affirmative defense expressly does not apply to the pandering

provision.[40]

## F. What Congress Has Done Differently

At the outset of our discussion, we note that the new pandering provision

allays certain concerns voiced by the Court in *Free Speech Coalition.* First, the

Court's primary objection to the CPPA's pandering provision was that pandered

materials were criminalized for all purposes in the hands of any possessor based

on how they were originally pandered.[41] By moving the pandering provision from

the definitions section to a stand-alone status, and using language that targets only

the act of pandering, the new provision has shifted from regulation of the

underlying material to regulation of the speech related to the material. This

remedies the problem of penalizing individuals farther down the distribution chain

for possessing images that, despite how they were marketed, are not illegal child

pornography.

---

[39] 18 U.S.C. § 2252A(c).

[40] *Id.*

[41] 535 U.S. at 257-58, 122 S. Ct. at 1405-06 ("Materials falling within the proscription are tainted and unlawful in the hands of all who receive it, though they bear no responsibility for how it was marketed, sold, or described.").

18

With respect to its legislative findings for the PROTECT Act, Congress largely abandons the secondary effects and market deterrence justifications found wanting by the Court in *Free Speech Coalition,* although it does reiterate the need to ensure that the result of *Ferber* — driving illegal child pornography from the bookshelves — is extended to extinguish the "open and notorious trafficking in such materials" on the Internet.[42]  Congress instead focuses primarily on beefing up its findings that technological advancements since *Free Speech Coalition* have increased the prosecutorial difficulties raised by the ready availability of technology able to disguise depictions of real children (proscribable under *Ferber*) to make them unidentifiable or to make them appear computer-generated (defensible under *Free Speech Coalition*).[43]

Finally, the PROTECT Act provides a new definition for child pornography, which in addition to "real" child images includes (1) any digital or computer-generated image that is "indistinguishable" from that of a minor engaging in sexually explicit conduct,[44] and (2) a visual depiction that has been created or

---

[42]  Congressional Findings, § 501 at (15).

[43]  *Id.* at (4)-(13).

[44]  The definition of sexually explicit conduct for "indistinguishable" images is slightly narrower than the one attached to the pandering provision as set out above, requiring that depictions of sexual intercourse or lascivious exhibitions of the genital or pubic area also be "graphic" (18 U.S.C. § 2256(2)(B)), meaning "that a viewer can observe any part of the genitals

modified to appear as an identifiable minor engaging in sexually explicit

conduct.[45] The PROTECT Act also amended the general obscenity statute to

define a new category of unprotected synthetic child pornography that

incorporates, in part, the *Miller* definition. That law now prohibits the production,

distribution, receipt or possession, in an interstate commerce setting, of (1)

obscene visual depictions of any kind that depict a minor engaging in sexually

explicit conduct, and (2) any visual depiction that is, or appears to be, of a minor

engaging in certain enumerated "hard core" acts and lacks serious literary, artistic,

political, or scientific value.[46] Thus a virtual depiction of a minor involved in any

of the expressly listed acts is outlawed even where only one of the three *Miller*

prongs is explicitly satisfied.[47] Because the materials Williams possessed were

unquestionably depictions of "real" children, these new virtual child pornography

definitions are not directly at issue in this case, but the limitations of their reach

---

or pubic area of any depicted person or animal during any part of the time that the sexually explicit conduct is being depicted . . ." 18 U.S.C. § 2256(10).

[45] 18 U.S.C. § 2256(8). As discussed above, the affirmative defense that no real child was involved in the production of child pornography, which the Court found incomplete under the CPPA, has been extended to most possessors and distributors of these defined materials.

[46] 18 U.S.C. § 1466A(a)-(d). The enumerated acts are "graphic bestiality, sadistic or masochistic abuse or sexual intercourse, including genital-genital, oral genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex . . ." *Id.* at § 1466A(a)(2)(A).

[47] The general obscenity statute provides no affirmative defense that no real child was involved in the production of the image.

have implications regarding Congress's purpose for enacting the pandering provision, as we discuss below. For example, the definitions do not capture innocent pictures of children that pedophiles view, collect, and trade as "dirty" pictures. And it remains to be seen whether the Supreme Court will find acceptable the PROTECT Act's truncation of the *Miller* obscenity standard with respect to child pornography.

## G. Williams's Overbreadth Challenge

Under the overbreadth doctrine, a statute that prohibits a substantial amount of constitutionally protected speech is invalid on its face.[48] Williams asserts that the PROTECT Act prohibition of speech that "reflects the belief, or that is intended to cause another to believe" that materials contain illegal child pornography is no different than the CPPA's prohibition of images that "appear to be" or "convey the impression" of minors engaged in sexually explicit conduct that was struck down as overbroad in *Free Speech Coalition.*

We begin our analysis with the recognition that subsections (i) and (ii) of the PROTECT Act pandering provision capture perfectly what remains clearly restrictable child pornography under pre- and post-*Free Speech Coalition* Supreme

---

[48] *Free Speech Coalition,* 535 U.S. at 255, 122 S. Ct. at 1404 (citing *Broadrick v. Oklahoma*, 413 U.S. 601, 615, 93 S. Ct. 2908 (1973)).

Court jurisprudence: obscene simulations of minors engaged in sexually explicit conduct and depictions of actual minors engaged in same. As reviewed above, the government may constitutionally regulate, on interstate commerce grounds, the transportation and distribution of obscene material, even if it is legal to hold privately (i.e. non-real child pornography),[49] and may outlaw "real" child pornography for all purposes, including private possession.[50] However, the PROTECT Act pandering provision criminalizes not the speech expressed in the underlying materials described in (i) and (ii), but the speech promoting and soliciting such materials. The question before us is whether the restriction on that speech is too broad.

1. **The Government may wholly prohibit commercial speech that is false or proposes an illegal transaction.**

We recognize that, if we consider the pandering provision as purely a restriction of commercial speech, we do not apply strict overbreadth analysis.[51]

---

[49] *Orito*, 413 U.S. at 141, 93 S. Ct. at 2676.

[50] *Osborne*. 495 U.S. at 110, 110 S. Ct. at 1696; *Ferber*, 458 U.S. at 760, 102 S. Ct. at 3359.

[51] *See Bd. of Tr. of the State Univ. of New York v. Fox*, 492 U.S. 469, 477-81, 109 S. Ct. 3028, 3033-35 (1989) (holding that the "least restrictive means" test does not apply to commercial speech cases); *see also Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 463 n.20, 98 S. Ct. 1912, 1922 (1978) (observing that "the justification for applying overbreadth analysis applies weakly, if at all, in the ordinary commercial context" because "[c]ommercial speech is not as likely to be deterred as noncommercial speech" and therefore does not require the added

22

Instead, we determine whether the government has narrowly tailored any content-based regulation on protected speech, that is neither misleading nor related to unlawful activities, to achieve its desired legitimate objectives.[52] Under this analysis, the government may prohibit completely the advertisement or solicitation of an illegal product or activity as well as false or misleading advertisement because neither is protected speech.[53] If a person possessing or seeking either obscene synthetic child pornography or "real" child pornography, offers to sell or buy it, this is unlawful commercial activity that the government may constitutionally proscribe. If a person does not have obscene or "real" child pornography but offers such things for sale, then the offeror is engaged in false or misleading advertising, which the government may likewise punish.

If all that the pandering provision stood for was that individuals may not commercially offer or solicit illegal child pornography nor falsely advertise non-obscene material as though it were, the Government need not show that it has narrowly tailored its restriction because neither of these scenarios involve

protection afforded by the overbreadth doctrine to third parties not before the bar).

[52] *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n,* 447 U.S. 557, 100 S. Ct. 2342 (1980) (setting out the constitutional test for restrictions on commercial speech).

[53] *See Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 770, 96 S. Ct. 1817*, 1829-30 (1976).

protected speech.  We observe, however, that false or misleading commercial advertising is already addressed under other state and federal laws, which are aimed at protecting consumers from fraud.  Here, under legislation aimed at protecting children, the only person who is harmed by misleading speech, even if it preys on the basest of motives, is the would-be buyer of illegal child pornography, and that individual is scarcely in a position to complain.  Also, although the the penalties for false commercial advertising are not specifically raised here,[54] we note that a mere false commercial advertiser is punished on par with an actual child pornographer, without regard to the actual content or even existence of underlying material.  Thus, a person offering for sale a copy of Disney's Snow White on false claims that it contains depictions of minors engaged in sexually explicit conduct has committed a crime punishable by a fine and at least five- and up to twenty-years' imprisonment,[55] a decidedly disproportionate and draconian penalty.

Because the First Amendment allows the absolute prohibition of both truthful advertising of an illegal product and false advertising of any product and

---

[54]  The materials touted by Williams in this case were clearly illegal child pornography and we do not, in the commercial context, consider the overbreadth chilling effect on third parties not before the court.

[55]  18 U.S.C. § 2252A(b)(1).

24

because, in the commercial context, we have before us no challenge to the severity of punishment meted out for such behavior, the pandering provision would likely pass our muster as a prohibition of unprotected forms of commercial speech, if that were all it proscribed. However, the law is not limited to commercial exploitation and continues to sweep in non-commercial speech. Accordingly, we must move to the question of whether the restriction on such non-commercial speech is constitutionally overbroad.

### 2. The PROTECT Act pandering provision continues to sweep in protected non-commercial speech.

Because it is not limited to commercial speech but extends also to non-commercial promotion, presentation, distribution, and solicitation, we must subject the content-based restriction of the PROTECT Act pandering provision to strict scrutiny, determining whether it represents the least restrictive means to advance the government's compelling interest or instead sweeps in a substantial amount of protected speech.[56] Under this analysis, we find the language of the provision problematic for three reasons.

First, that pandered child pornography need only be "purported" to fall under the prohibition of §2252A(a)(3)(B) means that promotional or speech is

---

[56] *United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 120 S. Ct. 1878 (2000).

25

criminalized even when the touted materials are clean or non-existent. We echo Senator Leahy's concern that the provision thus "federally criminalize[s] talking dirty over the Internet or the telephone when the person never possesses any material at all."[57] In a non-commercial context, any promoter — be they a braggart, exaggerator, or outright liar — who claims to have illegal child pornography materials is a criminal punishable by up to twenty years in prison, even if what he or she actually has is a video of "Our Gang," a dirty handkerchief, or an empty pocket.

Further, while the commercial advertisement of an unlawful product or service is not constitutionally protected, this feature of the Supreme Court's commercial speech doctrine does not apply to non-commercial speech, where the description or advocacy of illegal acts is fully protected unless under the narrow circumstances, not applicable here, of immediate incitement. The First Amendment plainly protects speech advocating or encouraging or approving of otherwise illegal activity, so long as it does not rise to "fighting word" status.[58]

---

[57] S. REP. NO. 108-2, title VIII, at 23 (2003).

[58] *See Free Speech Coalition*, 535 U.S. at 253, 122 S. Ct. at 1403 (*citing Brandenburg v. Ohio*, 395 U.S. 444, 447, 89 S. Ct. 1827 (1969) (holding advocacy of racist violence protected speech)). *See also Kingsley Int'l Pictures Corp. v. Regents of the Univ. of State of N.Y.*, 360 U.S. 684, 79 S. Ct. 1362 (1959) (holding advocacy of immoral activities was protected speech).

Thus, the non-commercial, non-inciteful promotion of illegal child pornography, even if repugnant, is protected speech under the First Amendment.

Finally, we find particularly objectionable the criminalization of speech that "reflects the belief" that materials constitute obscene synthetic or "real" child pornography. Because no regard is given to the actual nature or even the existence of the underlying material, liability can be established based purely on promotional speech reflecting the deluded belief that real children are depicted in legal child erotica, or on promotional or solicitous speech reflecting that an individual finds certain depictions of children lascivious.[59]

Because lascivious is not defined under the PROTECT Act, we apply its ordinary meaning of "exciting sexual desires; salacious."[60] What exactly constitutes a forbidden "lascivious exhibition of the genitals or pubic area"[61] and how that differs from an innocuous photograph of a naked child (e.g. a family photograph of a child taking a bath, or an artistic masterpiece portraying a naked child model) is not concrete. Generally, courts must determine this with respect to

---

[59] 18 U.S.C. §§ 2252A(a)(3)(B)(ii), 2256(2)(A)(v).

[60] AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 4th Ed. (2000)

[61] 18 U.S.C. § 2256(2)(A)(v).

the actual depictions themselves.[62]  While the pictures needn't always be "dirty" or even nude depictions to qualify, screening materials through the eyes of a neutral factfinder limits the potential universe of objectionable images.[63]

In this case, however, the law does not seek to attach liability to the materials, but to the ideas and images communicated to the viewer by those materials.  This shifts the focus from a community standard to the perverted but privately held belief that materials are lascivious.  Through this lens, virtually all depictions of children, whom to pedophiles are highly eroticized sexual objects, are likely to draw a deviant response.  Many pedophiles collect and are sexually stimulated by nonpornographic depictions of children such as commercially produced images of children in clothing catalogs, television, cinema, newspapers,

---

[62]  Virtually all lower courts that have addressed the meaning of "lascivious exhibition" have embraced the widely followed "Dost" test, originally developed by a California district court and affirmed in an opinion by the Ninth Circuit.  *United States v. Dost,* 636 F. Supp. 828, 832 (S.D. Cal. 1986) *judgm't aff'd, United States v. Wiegand*, 812 F.2d 1239 (9th Cir. 1987).  The test identifies six factors that are relevant to the determination  of whether a picture constitutes a "lascivious exhibition of the genitals or pubic area" under child pornography law.

[63]  The Third Circuit has held that a depiction can constitute "lascivious exhibition of the genitals" even if a child is wearing clothes.  *United States v. Knox,* 32 F.3d 733, 746 (3d Cir. 1994) (discussing the discernability of young girls' genitals through "thin but opaque clothing").  Although the material was purchased by Knox for sexual stimulation, the videotapes seized from him did not portray explicit sexual acts nor even depict nudity; rather, they contained "vignettes of teenage and preteen females" engaged in baton twirling and gymnastics routines and sometimes "striking provocative poses for the camera."  *Id.*  We note that the requirement that lascivious exhibitions be "graphic" under the PROTECT Act's amended obscenity definition likely eliminates a *Knox* result under the obscenity statute.  *See* n.46, *supra.*  However, that narrower definition does not apply to the pandering provision.

and magazines — otherwise innocent pictures that are not traditionally seen as child pornography and which non-pedophiles consider innocuous.[64] As illustrated in this case, relatively innocent candid snapshots of children, such as those initially exchanged by the defendant Williams and the undercover agent, are also collected and used as a medium of exchange. We cannot, however, outlaw those legal and mainstream materials and we may not outlaw the thoughts conjured up by those legal materials.

Freedom of the mind occupies a highly-protected position in our constitutional heritage. Even when an individual's ideas concern immoral thoughts about images of children, the Supreme Court has steadfastly maintained the right to think freely. As the Court stated in *Free Speech Coalition,* "First Amendment freedoms are most in danger when the government seeks to control thought or justify its laws for that impermissible end. The right to think is the beginning of freedom, and speech must be protected from the government because

---

[64] Amy Adler, *The Perverse Law of Child Pornography*, 101 COLUM. L. REV. 209, 259-260 (2001). The highly eroticized use of children in fashion, television, and advertising is now the "soft porn" of child pornography. *Id.* Members of the North American Man Boy Love Association (NAMBLA — an organization for pedophiles, many of whom are in prison) reportedly find erotic stimulation by watching children on network television, the Disney channel, and mainstream films. *Id.* at 260. As one investigator put it: "I had found NMBLA's 'porn' and it was Hollywood. *Id.* (citation omitted)

29

speech is the beginning of thought."[65] The Court reiterated that the concern with child pornography is "physiological, emotional, and mental health" of children, and thus regulation is permissible only when targeted at the evils of the production process itself, and not the effect of the material on its eventual viewers.[66] The PROTECT Act pandering provision misses that target and, instead, wrongly punishes individuals for the non-inciteful expression of their thoughts and beliefs.[67] However repugnant we may find them, we may not constitutionally suppress a defendant's beliefs that simulated depictions of children are real or that innocent depictions of children are salacious.

3. **The Supreme Court's decision in *Ginzburg* does not support pandering as an independent offense**

The Government's central justification for the pandering provision, found convincing by the district court, relies on the Supreme Court's decision in *Ginzburg v. United States*,[68] for the proposition that an individual may be found

---

[65] 535 U.S. at 253, 122 S. Ct. at 1403 (finding that the fact that possession of non-obscene virtual child pornography may cause sexually immoral thoughts about children was not enough to justify banning it).

[66] *Id.*

[67] *Stanley,* 394 U.S. at 566, 89 S. Ct. at 1249 (stating that legislator's "cannot constitutionally premise legislation on the desirability of controlling a person's private thoughts").

[68] 383 U.S. 463, 86 S. Ct. 942 (1966).

30

criminally liable for promoting material as appealing to prurient interests even though the material actually being promoted might not fall outside the First Amendment's protection. We believe that reliance is ill-grounded.

In *Ginzburg,* erotic publications that were not "hard core" pornography, and may not have been obscene per se, became the subjects of conviction because their prurient qualities were exploited, or pandered, by the defendant for commercially sexual purposes. The Court found that evidence of the manner in which the publications were advertised and mailed "was relevant in determining the ultimate question of obscenity," and that evidence of such pandering on the basis of salacious appeal "may support the determination that the material is obscene even though in other contexts the material would escape such condemnation."[69] In *Free Speech Coalition*, the Court recognized the limited scope of the pandering rationale expressed in *Ginzburg*: that "in close cases evidence of pandering may be probative with respect to the nature of the material in question and thus satisfy the [obscenity] test."[70] The Court also suggested that *Ginzburg* has no application

---

[69] *Id.* at 470, 476, 86 S. Ct. at 947, 950.

[70] 535 U.S. at 258, 122 S. Ct. at 1406 (quoting *Ginzburg* at 474, 86 S. Ct. 942). The Court in *Ginzburg* applied the test for obscenity set out in *Roth v. United States,* 354 U.S. 476, 77 S. Ct. 1304 (1957), which preceded the current *Miller* test, but the differences between the tests are immaterial for the purposes of our analysis.

where, as in the case of the CPPA, "[t]he statute does not require that the context be part of an effort at commercial exploitation."[71]

We disagree with the district court that *Ginzburg* supports a prohibition of pandering as a stand-alone crime without regard to the legality, or even to the existence, of the pandered material. First, we note that, notwithstanding its brief mention by the Court in *Free Speech Coalition*, there is some question as to the continued vitality of the *Ginzburg* pandering rationale. Shortly after *Ginzburg* was decided, the Supreme Court held in *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*[72] that truthful, non-misleading commercial speech is protected by the First Amendment, although to a lesser degree than protected non-commercial speech. The sort of pandering that caused the publications in *Ginzburg* to be found obscene, in other words, has since gained some First Amendment protection. In one of two post-*Ginzburg* cases in the 1970s, a dissent joined by four justices states that "*Ginzburg* cannot survive *Virginia Pharmacy.*"[73] While the Supreme Court has not substantially addressed the *Ginzburg* pandering rationale since the 1970s, Justice Stevens more recently

---

[71] *Id.* (internal quotation marks and citation omitted).

[72] 425 U.S. 748, 96 S. Ct. 1817 (1976),

[73] *Splawn v. California*, 431 U.S. 595, 603 n.2, 97 S. Ct. 1987 (1977) (Stevens, J., dissenting).

32

reiterated that, since *Ginzburg* was decided before the Court extended First Amendment protection to commercial speech, a proposal that otherwise legal material be deemed obscene on the basis of its titillating marketing, is "anachronistic."[74] Consequently, although *Ginzburg* has not been overturned, its precedential value is questionable.

Even if the *Ginzburg* pandering rationale remains viable, the PROTECT Act pandering provision, as discussed above, is not limited to the commercial context. In considering the CPPA pandering provision at issue in *Free Speech Coalition,* the Court clearly suggested that, even if the *Ginzburg* pandering rationale remains viable, it would only apply in a the commercial context.[75] The PROTECT Act pandering provision, like the CPPA pandering provision found unconstitutional in *Free Speech Coalition,* does "not require that the context be part of an effort at 'commercial exploitation.'"[76]

Finally, to the extent that the *Ginzburg* pandering rationale remains valid, it lends little constitutional support to the pandering provision at issue here. With respect to the "obscene" virtual or simulated material described under subsection

---

[74] *Playboy Entm't Group, Inc.*, 529 U.S. at 829 120 S. Ct.1878 (Stevens, J., concurring).

[75] 535 U.S. at 258, 122 S. Ct. at 1406 (2002).

[76] *Id.* (citation and internal quotation marks omitted).

33

(ii), if the pandering rationale remains valid, then it might be the basis for a court to uphold a conviction under the PROTECT Act for distributing material of questionable social value that would not be deemed obscene but for the defendant's promotion of it suggesting that it was. But if the rationale holds, then this would be the case under existing obscenity law and the pandering provision adds nothing in that respect. The rationale does not justify a prosecution under the PROTECT Act that goes farther than existing obscenity law by attempting to convict a defendant for distributing material that is *clearly* not obscene, merely because the defendant pandered it as obscenity.[77]

With respect to "real" child pornography as described under subsection (ii), the *Ginzburg* pandering rationale is of no relevance. If the pandering rationale remains relevant to determinations of obscenity, it does so because such determinations are made by a subjective test that weighs a publication's degree of

---

[77] A congressional report offers the example of the movie "Carnal Knowledge," which the Supreme Court found not to be obscene because it was not patently offensive. *See* H. Cohen, CRS Report for Congress: Child Pornography: Constitutional Principles and Federal Statutes Produced Without an Actual Child: Constitutionality of 108th Congress Legislation (2003) (citing *Jenkins v. Georgia*, 418 U.S. 153, 94 S. Ct. 2750 (1974)). Under the PROTECT Act, if a defendant distributed "Carnal Knowledge" "in a manner that "reflects the belief, or that is intended to cause another to believe" that it contained an obscene visual depiction of a child, then the defendant would be guilty of a crime. *Id.* But the pandering rationale of *Ginzburg* allows merely "that in close cases evidence of pandering may be probative" of obscenity. *Id.* "Carnal Knowledge," because of the Supreme Court decision, is not a close case; therefore, to distribute it in a pandering manner would not make it obscene. *Id.*

social value under the *Miller* test. *Ginzburg* held only that pandering may be probative of those factors. Determinations of "real" child pornography as described in subsection (ii), on the other hand, are made by a purely objective test: whether or not the material visually depicts an actual minor engaged in sexually explicit conduct. The manner in which the material is promoted has no bearing on the answer to this question. As one commentator observed, "[n]o amount of pandering, even misleading pander, can convert a virtual child into a real child."[78]

In sum, the Government urges us to read the PROTECT Act as writing the *Ginzburg* pandering rationale into the law. We note that at least one state law concerning obscene visual depictions of children has succinctly done just that.[79] But the Government asks us to stretch that rationale much farther, to support pandering as an independent crime rather than only as evidence of the crime of obscenity or child pornography. We believe such an interpretation of *Ginzburg* butts directly against the holding of *Free Speech Coalition* and, accordingly, find

---

[78] *Stopping Child Pornography: Protecting Our Children and the Constitution: Hearing on S. 2520 Before the Senate Comm. On the Judiciary,* 107th Cong. (2002) (testimony of Harvard School of Law Professor Frederick Schauer).

[79] *See, e.g.,* ALA. CODE § 13A-12-195 (2005), providing that "[w]here the circumstances of the dissemination or public display of matter indicates that it is being commercially exploited by the defendant for its prurient appeal, such evidence may be considered in determining whether the matter appeals to the prurient interest, is patently offensive, or lacks serious literary, artistic, political or scientific value."

35

that *Ginzburg* does not rescue the PROTECT Act pandering provision from

substantial overbreadth.[80]

4.   **The PROTECT Act pandering provision is not justified by legislative findings.**

The pandering provision of the PROTECT Act, for reasons we have

discussed, is inconsistent with *Miller* and *Ferber*, as reaffirmed in *Free Speech*

*Coalition,* and is not sustainable under *Ginzburg*.  The Government, however,

seeks to justify its prohibitions in other ways.

First, noting the state's compelling interest in protecting children from those

who sexually exploit them, Congress relies on *Ferber* and *Osborne* for the

---

[80]   Because it was an issue much debated by Congress and commentators in the wake of *Free Speech Coalition,* we do not ignore the "Romeo and Juliet" problem discussed at length in that case.  *See* n.27, *supra.*  The Court's concern with outlawing material either containing a depiction that "appear[ed] to be" a minor engaging in sexually explicit conduct or that was presented or promoted "in a manner that convey[ed] the impression" that it contained such depictions, was that the whole aim of dramatic presentation is to make fictional happenings "appear" to be real.  Under the overbroad definition of the CPPA, non-obscene movies employing youthful actors to simulate minors engaged in apparent sexually explicit conduct could be ensnared, even though no child was involved in the production
     Here, Williams urges that the PROTECT Act's "intended to cause another to believe" language is no different than the "appears to be" and "conveys the impression that" language found overbroad by the Court.  While the Government argues it is a cure, we do not, for reasons discussed in this section, find the insertion of the word "obscene" into the material description particularly meaningful in avoidance of sweeping in meritorious works where the statute is punishing activity that is unrelated to the actual contents of the material.  And if there is otherwise a constitutionally relevant distinction between the sweep of PROTECT and COPPA in this regard, it is a fine one.  Whether, in an industry that functions on the suspension of disbelief, legitimate presenters and promoters of artistically meritorious films intend that viewers truly "believe" real minors are involved in such productions or, rather, simply invite the viewer imagine, is debatable.  Because we find the Act infirm on a number of other fronts, we need not split this hair.

36

proposition that this interest extends to stamping out the market for child pornography.[81] However, Congress has not adequately explained why the mere pandering of otherwise legal material should be prohibited in the pursuit of this interest.

In the PROTECT Act's Conference Report, Congress mentions that "even fraudulent offers to buy or sell unprotected child pornography help to sustain the illegal market for this material."[82] This appears to be a resurrection of the market-deterrence theory advanced by the Government, and rejected by the Court, in *Free Speech Coalition*. As the Court recognized, the prohibitions of "real" child pornography in *Ferber* and *Osborne* were upheld on a production-based rationale. The Court in *Ferber* allowed market deterrence restrictions because they destroyed the profit motive to exploit real children. Congress has again failed to articulate specifically how the pandering and solicitation of legal images, even if they are promoted or believed to be otherwise, fuels the market for illegal images of real children engaging in sexually explicit conduct.

---

[81] Congressional Findings (501) at (2)-(3) (citing *Osborne v. Ohio,* 495 U.S. 103, 110 (1990) and quoting *New York v. Ferber* 458 U.S. 747, 760 (1982) ("The most expeditious if not the only practical method of law enforcement may be to dry up the market for this material by imposing severe criminal penalties on persons, selling, advertising, or otherwise promoting the product.")).

[82] H.R. REP. NO. 108-66, Title V, at 62 (2003).

Next, the Government points to the legislative findings of the PROTECT Act that articulate the difficulties in successful prosecution of child pornography possession cases where advancements in computer technology allow images to be so altered as to cast reasonable doubt on whether they involve real children.[83] Congress characterizes the pandering provision as "an important tool for prosecutors to punish true child pornographers who for some technical reason are beyond the reach of the normal child porn distribution or production statutes."[84] The Government argues that, grounded on these findings, the pandering provision allows prosecutions to go forward against persons who not only have the intent to participate in the child pornography market, but who actively solicit others to participate in that market, regardless of whether the government can prove whether the underlying material is real child pornography or not. Without such prosecutorial tools, it argues, the child pornography market will flourish, harming real children.[85]

This argument not only attempts, once again, to revive the rejected market proliferation rationale but also disregards the firmly established principle that

---

[83]  *See* Findings 501 at (10)-(13).

[84]  S. REP. NO. 108-2, Title VIII, at 23 (2003)(remarks of Sen. Patrick Leahy).

[85]  *See* Findings 501 at (13).

"[t]he Government may not suppress lawful speech as the means to suppress unlawful speech.."[86]  And when the "technical reason" is that the material being described or exchanged does not fall within one of the two proscribable categories — but instead is legal child erotica, innocent pictures of children arousing only in the minds of certain viewers, or non-existent —  the Government cannot circumvent the criminal procedure process.  In a non-commercial setting, in which most child pornography is discussed and exchanged, pandering at most either raises actionable suspicion that illegal materials are possessed[87] or is evidentiary of the social merit of questionable materials.  The Government must do its job to determine whether illegal material is behind the pander.

The Government urges that we consider this simply an inchoate crime, arguing that only those with specific intent to traffic in illegal child pornography will be ensnared[88] and noting, for example, that offers to buy or sell illegal drugs

---

[86]  *Free Speech Coalition,* 535 U.S. at 255, 122 S. Ct. at 1404.

[87]  A number of courts have held that affidavits that defendants had joined Internet e-groups that members used to exchange child pornography provided probable cause to search their home, although there was no evidence that the defendants had ever downloaded any illegal visual depictions.  *See, e.g., United States v. Martin*, 426 F.3d 83 (2d Cir. 2005) *petition for cert. filed,* 2006 WL 448514 (U.S. Feb. 16, 2006) (No. 05-1073) (holding that textual email about child pornography exchanged by members of the e-group was not protected speech); *United States v. Coreas*, 426 F.3d 615 (2d Cir. 2005) (same);  *United States v. Froman*, 355 F.3d 882 (5th Cir. 2004)(same); *United States v. Hutto*, 84 Fed. Appx. 6 (10th Cir. 2003) (unpublished)(same).

[88]  *See* H.R. REP. NO. 108-66 (2003) (stating that the instant pandering provision "bans the offer to transact in unprotected material, coupled with proof of the offender's specific

39

can be punished even if no drugs actually exist.  However, the inchoate offenses

— attempt, solicitation, conspiracy — are covered elsewhere in the code.[89]

Further, the intent element only applies to one portion of the provision —

promoting material in a manner "that is intended to cause another to believe" it is

illicit — and, to be a violator, one need not intend to distribute illegal materials,

but only intend that another believe the materials one has are lascivious.  Also, a

defendant may be liable for promoting, distributing, or soliciting perfectly legal

materials that only he or she personally believes are lascivious.  As Professor

Schauer notes, "when the non-existence of illegality is a function not of the non-

existence of an illegal product but rather the non-illegality of an existing product,

the First Amendment returns to the picture."[90]  Finally, with any inchoate offense

---

intent."); S. REP. NO. 108-2, at 10 n.6 (2003) (stating that the provision requires the government to establish that the defendant acted with the specific intent to traffic in obscene material or actual child pornography).

[89] *See* 18 U.S.C. § 2252A(b)(1) (which expressly applies to the pandering provision) and 18 U.S.C. § 1466A(a) (criminalizing the attempt or conspiracy to produce or distribute obscene or real child pornography).

[90] *Stopping Child Pornography: Protecting Our Children and the Constitution: Hearing on S. 2520 Before the Senate Comm. On the Judiciary,* 107th Cong. (2002) (testimony of Professor Frederick Schauer).  We note that this is also what differentiates the instant pandering provision from state laws that criminalize the pandering of prostitution.  While a defendant may be convicted, for example, for soliciting sex from an undercover police officer, even though the officer has no intention of actually consummating the deal, in a jurisdiction that has outlawed prostitution, there is no circumstance under which sex for money may be legal.  For this reason, the Government's "phantom" drug analogy is also unpersuasive.

the government must show some substantial movement toward completing the crime, must prove, in other words, something beyond mere talk. Under the PROTECT Act pandering provision, mere talk is all that is required for liability and that does not square with Supreme Court First Amendment jurisprudence.

In sum, we recognize that Congress has a compelling interest in protecting children and, to that end, may regulate in interstate commerce settings the distribution or solicitation of the materials described in subsections (i) (obscene child pornography) and (ii) ("real" child pornography) of the PROTECT Act pandering provision. However, the pandering provision goes much farther than that. The provision abridges the freedom to engage in a substantial amount of lawful speech in relation to its legitimate sweep, and the reasons the Government offers in support of such limitations have no justification in the Supreme Court's First Amendment precedents. Accordingly, we find it unconstitutionally overbroad.

## H. Williams's Vagueness Challenge

The Government contends that, since the written plea agreement references only Williams's right to appeal his pandering conviction on grounds of overbreadth, he has waived his vagueness challenge. We disagree. We recognize that vagueness and overbreadth doctrines, although "logically related and similar,"

41

are distinct.[91]  However, plea bargains, as we have noted, are like contracts and

should be interpreted in accord with the parties' intent.[92]  Further, a written plea

agreement should be viewed against the background of the negotiations, avoiding

interpretation that directly contradicts an oral understanding; and, because it

constitutes a waiver of substantial constitutional rights, should be read, where in

doubt, against the government.[93]  The record in this case clearly reflects the

parties' intent to preserve Williams's constitutional challenges under both

overbreadth and vagueness doctrines.[94]  That the written memorialization of that

agreement omitted the latter of these related grounds is insufficient to support

waiver.

Laws that are insufficiently clear are void for three reasons: (1) to avoid

punishing people for behavior that they could not have known was illegal; (2) to

avoid subjective enforcement of the laws based on arbitrary or discriminatory

---

[91]  *Kolender v. Lawson*, 461 U.S. 352, 358 n.8, 103 S.Ct. 1855 (1983).

[92]  *United States v. Rubbo*, 396 F.3d 1330, 1334 (11th Cir. 2005).

[93]  *United States v. Nyhuis*, 8 F.3d 731, 742 (11th Cir. 1993) (quoting *United States v. Jefferies*, 908 F.2d 1520, 1523 (11th Cir. 1990).

[94]  Williams's motion to dismiss was expressly raised on grounds that the pandering provision was both overbroad and vague.  The remarks of counsel during the plea colloquy reference the parties' agreement that Williams was preserving challenges under both doctrines and the importance of a ruling on that motion to ensure preservation, especially as to the vagueness claim, was discussed at some length by the parties and the court.

interpretations by government officers; and (3) to avoid any chilling effect on the exercise of sensitive First Amendment freedoms.[95] Thus, to pass constitutional muster, statutes challenged as vague must give a person of ordinary intelligence a reasonable opportunity to know what is prohibited and provide explicit standards for those who apply it to avoid arbitrary and discriminatory enforcement.[96] Vagueness concerns are more acute when a law implicates First Amendment rights and a heightened level of clarity and precision is demanded of criminal statutes because their consequences are more severe.[97]

In this case, considering a penal statute that both restricts speech and carries harsh criminal penalties, it is not at all clear what is meant by promoting or soliciting material "in a manner that reflects the belief, or that is intended to cause another to believe" that touted or desired material contains illegal child pornography. This language is so vague and standardless as to what may not be said that the public is left with no objective measure to which behavior can be

---

[95] *Grayned v. City of Rockford*, 408 U.S. 104, 108-109, 92 S.Ct. 2294, 2298-2299 (1972). With respect to chilling effects, the problems of vagueness and overbreadth are, plainly, closely intertwined  since those persons covered by the statutes are bound to limit their behavior to that which is unquestionably safe.

[96] *Kolender,* 461 U.S. at 357, 103 S. Ct. at 1858 (1983); *Bama Tomato Co. v. U.S. Dept. of Agriculture*, 112 F.3d 1542 (11th Cir. 1997).

[97] *Village of Hoffman Estates, Inc. v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498, 499, 102 S. Ct. 1186 (1982).

conformed. Moreover, the proscription requires a wholly subjective determination by law enforcement personnel of what promotional or solicitous speech "reflects the belief" or is "intended to cause another to believe" that material is illegally pornographic. Individual officers are thus endowed with incredibly broad discretion to define whether a given utterance or writing contravenes the law's mandates.[98]

Suppose, for example, the government intercepts an email claiming that the attached photographs depict "little Janie in the bath — hubba, hubba!" Does this "reflect a belief" on the sender's part that the photos are lascivious? As discussed above, the law does not require the pandered material to contain any particular content nor, in fact, that any "purported" material need actually exist. Since the "reflects the belief" portion of the statute has no intent requirement, the government establishes a violation with proof of a communication that it deems, with virtually unbounded discretion, to be reflective of perverse thought.

---

[98] *See City of Chicago v. Morales*, 527 U.S. 41, 119 S. Ct. 1849 (1999) (holding unconstitutionally vague an anti-loitering ordinance, which defined loitering as remaining in place with "no apparent purpose," finding that standard "inherently subjective because its application depends on whether some purpose is 'apparent' to the officer on the scene."); *City of Houston, Tex. v. Hill*, 482 US 451, 107 S. Ct. 2502 (1987) (finding unconstitutionally vague a city ordinance prohibiting speech that "in any manner" interrupts a police officer in the performance of his duties, without limitation to fighting words or to obscene or opprobrious language).

Regardless of what is actually depicted in the photos in our example — whether they are innocent baby-in-the-bubbles snapshots or candid stills of the family Rottweiler in a No. 10 washtub — regardless, in fact, of whether *any* photos are attached, this communication could be interpreted as criminal behavior. And because the PROTECT Act's affirmative defense does not apply to the pandering provision, it is no defense to show that the underlying materials are not, in fact, illegal child pornography.

Even more complex is the determination of what constitutes presentation in a "manner that is intended to cause another to believe" that material contains illegal child pornography. Let us consider, for example, an email entitled simply "Good pics of kids in bed." Let us also imagine that the "pics" are actually of toddlers in footie pajamas, sound asleep. Sender One is a proud and computer-savvy grandparent. Sender Two is a chronic forwarder of cute photos with racy tongue-in-cheek subject lines. Sender Three is a convicted child molester who hopes to trade for more graphic photos with like-minded recipients. If what the statute required was a specific intent to traffic in illegal child pornography, the identity of the sender and the actual content of the photos would be probative. Senders One and Two would be off the hook while Sender Three may warrant further investigation.

But again, the pandering provision requires no inquiry into the actual nature or even existence of the images and provides no affirmative defense that the underlying materials are not, in fact, illegal child pornography. The offense is complete upon communication "in a manner that," in the discretionary view of law enforcement, "is intended to cause another to believe" that materials are illegal child pornography. Here, the "manner" of presentation, as well as the plainly legal underlying material, are identical in all three instances. And Sender Two clearly intended that his recipients believe, however briefly, that the attached photos were sexually explicit depictions of minors.

While posting in a known child pornography chat room would clearly spotlight the true child abuser, in open cyberspace, which of these communicators is a criminal?[99] The pandering provision is devoid of any contextual parameters for the restriction on conduct that might illuminate its meaning and rescue it from vagueness.[100] Absent such a contextual backdrop, the language of this law is too

---

[99] *See Reno v. ACLU*, 521 U.S. 844, 876, 117 S. Ct. 2329 (1997) (recognizing that overly vague restrictions may curtail a significant amount of protected speech in the relatively borderless architecture of the Internet).

[100] *See, e.g., Boos v. Barry*, 485 U.S. 312, 332, 108 S. Ct. 1157, 1169-70 (1988); (noting that the court's interpretation of the challenged statute as protecting the "peace" was sufficiently precise because of the particular context of the peace of an embassy); *Grayned,* 408 U.S. at 112, 92 S. Ct. at 2304 (finding that an anti-noise ordinance was not vague where it was written specifically to forbid disturbance of schools because "prohibited disturbances are easily measured by their impact on normal activities of the school").

imprecise a standard to provide sufficient guard against arbitrary deprivation of a significant liberty interest.

We again recognize that Congress may regulate the distribution or solicitation of the illegal materials described in subsections (i) (obscene child pornography) and (ii) ("real" child pornography) of the pandering provision. If that were all the provision did, we would find no constitutional infirmity on vagueness grounds. However, the statute is unnecessarily muddled by the nebulous "purported material" and "reflects the belief, or is intended to cause another to believe" language. Because of this language, the pandering provision fails to convey the contours of its restriction with sufficient clarity to permit law-abiding persons to conform to its requirements. Because of this language, the provision is insusceptible of uniform interpretation and application by those charged with the responsibility of enforcing it. Accordingly, we find it impermissibly vague.

### III.  Williams's *Booker* Challenge

### A.  Standard of Review

Where, as here, there is a timely objection, we review a defendant's *Booker* claim in order to determine whether the error was harmless.[101]  There are two

---

[101]  *United States v. Mathenia*, 409 F.3d 1289, 1291 (11th Cir. 2005).

harmless error standards, one of which applies to *Booker* constitutional errors, the other to *Booker* statutory errors.[102]  Statutory errors are subject to the less demanding test that is applicable to non-constitutional errors.[103]  A non-constitutional *Booker* error is harmless if, viewing the proceedings in their entirety, a court determines that the error did not affect the sentence, or had but very slight effect.[104]  If one can say with fair assurance that the sentence was not substantially swayed by the error, the sentence is due to be affirmed even though there was error.[105]  Because this is a *Booker* statutory error case we will apply that standard.

### B.  No Reversible *Booker* Error

Williams was assessed (1) a two-level sentence enhancement for use of a computer for transmission, receipt or distribution of child pornography (2) a two-level sentence enhancement for possession of child pornography because the pornographic material at issue involved minors under age twelve, and (2) a four-level sentence enhancement because the material involved portrayed sadistic or

---

[102]  *Id.*

[103]  *Id.*

[104]  *Id.* (citation and internal quotation marks omitted).

[105]  *Id.*

masochistic conduct or other depictions of violence. Because these enhancements were applied under a mandatory guidelines scheme, error occurred.[106] However, because Williams admitted to the factual basis for his sentence, which included the facts underlying these enhancements, there was no Sixth Amendment *Booker* error.[107]

We conclude that, viewing the proceedings in their entirety, the sentence was not substantially swayed by the statutory error. Williams was sentenced above the bottom of the 57 to 71 month guideline range for the possession count, and the district court, exercising its discretion, expressly declined his request for a lower sentence within that range. The court also stated that, even if not bound by the guidelines, it had doubts that the sentence would be any lower, and it may have been higher. While the judge declined to issue an alternative sentence in anticipation of *Blakely*'s application to the guidelines given the then-settled state of that issue in this circuit, he explained his decision thoroughly enough that we are confident that he would not lower the sentence in this case on remand.

## IV. Conclusion

---

[106] *See United States v. Shelton*, 400 F.3d 1325, 1331 (11th Cir. 2005).

[107] *Id.* at 1329-30.

49

In the wake of *Free Speech Coalition,* sexually explicit speech regarding children that is neither obscene nor the product of sexual abuse of a real minor retains protection of the First Amendment. We believe the Court's decision in *Free Speech Coalition* leaves Congress ample authority to enact legislation that allows the Government to accomplish its legitimate goal of curbing child abuse without placing an unacceptably heavy burden on protected speech. Certainly Congress took many cues from the Court in drafting the legislation at issue in this case.

Given the unique patterns of deviance inherent in those who sexually covet children and the rapidly advancing technology behind which they hide, we are not unmindful of the difficulties of striking a balance between Congress's interest in protecting children from harm with constitutional guarantees. However, the infirmities of the PROTECT Act pandering provision reflect a persistent disregard of time-honored and constitutionally-mandated principles relating to the Government's regulation of free speech and its obligation to provide criminal defendants due process. Because we find the PROTECT Act pandering provision, 18 U.S.C. § 2252A(a)(3)(B), both substantially overbroad and vague, and therefore facially unconstitutional, we reverse Williams's conviction under that section. However, because we find no reversible *Booker* error in his sentencing

50

for possession of illegal child pornography, we affirm his sentence of 60-months imprisonment.

CONVICTION REVERSED AND SENTENCE ON COUNT ONE VACATED; SENTENCE ON COUNT TWO AFFIRMED.